**FILED**
**JANUARY 21, 2008**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **Michael R. Camacho,**<br><br>                    **Plaintiff,**<br><br>vs.<br><br>**CareerBuilder, LLC,**<br><br>                    **Defendant.** | **08 C 448**<br><br>**JURY TRIAL DEMANDED**<br>**JUDGE ZAGEL**<br>**MAGISTRATE JUDGE SCHENKIER** |

# COMPLAINT

Plaintiff, Michael R. Camacho, complains against Defendant, CareerBuilder, LLC., as follows:

**Nature of the Case:**

1. Staff Sergeant Michael R. Camacho, United States Marine Corps Reserve, sues CareerBuilder, LLC ("CareerBuilder") for discriminating against, retaliating against, and constructively discharging him in violation of the Uniformed Services Employment and Reemployment Rights Act ("USERRA"), 38 U.S.C. § 4301 *et seq*.

**Plaintiff's employment with Defendant:**

2. Michael R. Camacho began working at CareerBuilder in April 2005 as a Support Technician II in CareerBuilder's IT Department at CareerBuilder's corporate headquarters in downtown Chicago, Illinois.

3. Michael R. Camacho is currently a Staff Sergeant ("SSgt.") in the United States Marine Corps Reserve. At the time of hire by CareerBuilder, he was a Sergeant with nearly 6 years of service as an active and reserve duty Marine.

4. Soon after SSgt. Camacho began his employment, he notified his supervisor, David Wolfe, that he would be absent for approximately 14 days for military training in May 2005.

1

5. Mr. Wolfe told one of SSgt. Camacho's co-workers that ""if [he]'d known [SSgt. Camacho] was in the military, [he] would not have hired him." *See Exhibit A, DOL Letter, October 18, 2007, attached, exhibits omitted.*

6. CareerBuilder reduced SSgt. Camacho's job duties and monitored his emails upon his return.

7. SSgt. Camacho's co-workers did not have their emails monitored and/or did not have their job duties change without explanation after returning from absences.

8. In October 2005, SSgt. Camacho received the additional duties of a promotion, but was denied a raise in pay, unlike co-workers who received similar promotions.

9. Co-workers without military obligations who were promoted received immediate increases in pay commensurate with their promotion.

10. CareerBuilder denied SSgt. Camacho the annual raises that his non-military co-workers received.

11. CareerBuilder did not raise SSgt. Camacho's salary until March 2006.

12. On several occasions, SSgt. Camacho's supervisor mocked SSgt. Camacho's military service by referring to the Marine Corps as the "Boy Scouts" and to Marine Corps training drills as "camping trips" and made other demeaning remarks about SSgt. Camacho's military service.

13. CareerBuilder monitored all aspects of SSgt. Camacho's work and nit-picked over his work in ways none of his non-military co-workers experienced.

14. SSgt. Camacho never received a written discipline, reprimand or warning throughout his entire employment history with CareerBuilder.

15. SSgt. Camacho worked long hours, rarely missed work for reasons other than military leave, and got along well with his co-workers.

16. At all times relevant to this complaint, CareerBuilder evaluated SSgt. Camacho and his co-workers on a quarterly and annual basis.

17. SSgt. Camacho received evaluation scores that rated him as meeting and/or exceeding expectations, as they were defined by CareerBuilder, for a majority of the performance evaluations conducted by SSgt. Camacho's supervisors over the course of SSgt. Camacho's employment by CareerBuilder.

18. In early July 2006, SSgt. Camacho received an above-average evaluation score for the 2nd Quarter of 2006 from his immediate supervisor, Ron Roden.

19. After receiving this evaluation, SSgt. Camacho told Human Resources ("HR") that based on Mr. Wolfe's words and actions, he was worried that he would be retaliated against for going out on military duty at the end of the month.

20. SSgt. Camacho asked that a paper copy of the 2d Quarter 2006 evaluation be placed in his file, because otherwise, the only record of this evaluation would be in digital form on the CareerBuilder network.

21. Shortly thereafter, SSgt. Camacho told his supervisor that he would be away for military duty at the end of July 2006.

22. About one week after SSgt. Camacho reported discrimination to HR and notified Mr. Wolfe of upcoming military duty, Mr. Wolfe changed SSgt. Camacho's above-average score on the 2d Quarter 2006 evaluation to a below-average score, without warning, notice or explanation to SSgt. Camacho.

23. SSgt. Camacho protested this change when he returned, and CareerBuilder agreed to return the evaluation to its original score.

24. In September 2006, SSgt. Camacho's department was reorganized, and SSgt. Camacho was given a new title and additional responsibilities, but he was not given a raise.

25. On or about October 20, 2006, SSgt. Camacho notified HR in writing, that he was being unfairly compensated compared to others in his department. He also asked for job descriptions and pay ranges for his and other positions so that he would have more information about his responsibilities.

26. On November 10, 2006, SSgt. Camacho was on military duty for the day due to Toys For Tots and the Marine Corps Birthday celebration.

27. On November 13, 2006, SSgt. Camacho's new supervisor contacted HR to find out how to fire SSgt. Camacho while "mak[ing] sure the business is not impacted" by the termination. *See Exhibit B, attached, without waiving any objections to redactions that were made before document was received by Plaintiff pursuant to a FOIA request to the Department of Labor.*

28. SSgt. Camacho continued to ask for job descriptions in November and December 2006.

29. On or about December 11, 2006, SSgt. Camacho received an above-average annual evaluation score for the period covering January 1, 2006 through December 31, 2006, but he did not receive an annual raise like everyone else in his department.

30. On or about December 13, 2006 SSgt. Camacho contacted HR about his upcoming military duty and asked that a paper copy of his most recent evaluation be put in his personnel file for safe-keeping.

31. On or about December 15, 2006 SSgt. Camacho notified his boss that he would be absent for military training January 8-12, 2007.

32. On January 10, 2007, while SSgt. Camacho was away for military duty, he received an email from his supervisor asking why a certain project was not being worked on that day.

33. SSgt. Camacho responded immediately that he was on duty, and he attached a copy of the December 15th email in which he notified his boss of the January drill.

34. Upon receiving this response, the supervisor again emailed HR for guidance on how to fire SSgt. Camacho without "overstep[ping] any boundaries that could compromise the company." *See Exhibit C, January 10, 2007 email, attached, with redactions per amendments to F.R.C.P. 5.2, effective December 1, 2007.*

35. The next day, January 11, 2007, SSgt. Camacho notified his supervisor that he would need to report for additional military duty on February 1, 2007.

36. Later that day, on January 11, 2007, SSgt. Camacho was evaluated again, in absentia, for the 4th Quarter of 2006, (this quarter already been covered by the 2006 annual review, in which he received an above-average score).

37. He received a failing score, for the first time.

38. On January 15, 2007, SSgt. Camacho, who did not yet know about failing the latest evaluation, again asked HR for help with his boss because he was "being targeted" due to his military service. *See Exhibit D, January 15, 2007 email, attached, with redactions per amendments to F.R.C.P. 5.2, effective December 1, 2007.*

39. That same day, SSgt. Camacho's boss sent out an email to put the termination in motion before SSgt. Camacho returned to the office. *See Exhibit E, January 15, 2007 email, attached, with redactions per amendments to F.R.C.P. 5.2, effective December 1, 2007.*

40. On January 16, 2007, SSgt. Camacho found out about the failing evaluation score. He immediately emailed HR to find out how he could go from an above-average score to a failing grade in just four weeks, and to restate that he was being discriminated and retaliated against. *See Exhibit F, January 16, 2007 email, attached.*

41. SSgt. Camacho also told HR that he was being "forced out" due to his military service. *See Exhibit F*.

42. Meanwhile, SSgt. Camacho's termination was being scripted by his boss. HR personnel questioned the termination because it "[did]n't sound good" given SSgt. Camacho's recent reports of discrimination. *See Exhibit E; Exhibit G, January 16, 2007 email, attached, with redactions per amendments to F.R.C.P. 5.2, effective December 1, 2007.*

43. In the afternoon of January 16, 2007, SSgt. Camacho forwarded reports from his co-workers to HR, documenting all of the work SSgt. Camacho had done that contradicted his failing evaluation score.

44. Over the next week, SSgt. Camacho repeatedly asked HR for help with the evaluation problem, and asked his supervisor to justify the failing grade.

45. On January 22, 2007, SSgt. Camacho met with HR about 2d Quarter 2006 evaluation issues—he had recently found out that the original score had *not* been restored, and that his paper backups had been removed from his personnel file.

46. On January 23, 2007, SSgt. Camacho asked HR to provide him the results of the investigation into his complaints of military discrimination and retaliation.

47. On or about January 23, 2007, HR demanded SSgt. Camacho provide documents for his previous and upcoming military training, and to have his Battalion Commander call HR to verify the dates before HR would approve SSgt. Camacho's absence for military duty.

48. Never before had CareerBuilder asked to speak to any of SSgt. Camacho's command, nor had CareerBuilder ever asked to see any documents before SSgt. Camacho returned from duty.

49. Under USERRA, an employer has no authority to deny or grant permission to attend military duty, and an employer cannot require documentation to support an absence for military duty until *after* a service member returns from duty. *20 C.F.R. Parts 1002.87, 1002.85(c), 1002.121 through 1002.123.*

50. Unbeknownst to SSgt. Camacho, these heightened requirements were part of a "great plan" to fire SSgt. Camacho for unapproved leave on January 26, 2007. *See Exhibit H, Great Plan Email, January 26, 2007, attached, with redactions per amendments to F.R.C.P. 5.2, effective December 1, 2007*.

51. The "great plan [did]n't work[] out" because SSgt. Camacho was able to provide documentation of his orders, therefore, he could not be fired for "unapproved leave." *See Exhibit H*.

52. Between January 26 and January 31, 2007, SSgt. Camacho made additional requests to HR and his supervisor for a written explanation of his failing evaluation and the results of the discrimination investigation he requested.

53. On or about January 26, 2007, two hours after the Great Plan Email notified SSgt. Camacho's boss that SSgt. Camacho could <u>not</u> be fired that day, SSgt. Camacho's boss replied to SSgt. Camacho's request for information by saying that "HR has suggested I not send you my notes." *See Exhibit I, attached, with redactions per amendments to F.R.C.P. 5.2, effective December 1, 2007*.

54. SSgt. Camacho was told on or about January 30, 2007, that he would be put on a Performance Improvement Plan ("PIP")—in essence, probation—when he returned from duty.

55. SSgt. Camacho filed a complaint with the U.S. Department of Labor on or about January 30, 2007.

56. After this and just before SSgt. Camacho left for military training on or about February 6, 2007, SSgt. Camacho saw recent emails—including the Great Plan Email of January 26, 2007 and the January 10, 2007 email from his supervisor asking how to fire him without "compromising the company,"—in the course of performing his regular job functions.

57. SSgt. Camacho was stunned to see that the decision to fire him had been made months ago, and that the only sticking point was how to do it in a way that appeared legal.

58. By this time, SSgt. Camacho had already endured nearly two years of vigilance to protect his USERRA rights and his job, verbal insults and mockery of his service from his supervisor, and the fear—every time he left for military duty—that he was not going to have a job, and health insurance for himself and his wife, to come back to.

59. Throughout his employment, SSgt. Camacho suffered stress, anger, anxiety about his future, and significant mental strain as a result of CareerBuilder's actions.

60. Nonetheless, until he saw the emails, SSgt. Camacho harbored the hope that if he continued to do excellent work, he would still have a job at CareerBuilder.

61. SSgt. Camacho went on active duty on February 6, 2007.

62. At the end of February 2007, the Department of Labor contacted CareerBuilder to investigate SSgt. Camacho's complaint of discrimination and retaliation.

63. At the end of February 2007, CareerBuilder cut off SSgt. Camacho's access to the CareerBuilder network and his CareerBuilder email account.

6

64. Between February and June 2007, while SSgt. Camacho was on active duty with the Marine Corps, he was in contact with CareerBuilder several times to apprise them of his active duty extensions and to make sure his health insurance was current.

65. In July 2007, as SSgt. Camacho was about to return from active duty, he resigned because he could not bear going back to a place: that had a "great plan" to fire him; that was going to monitor his every move like it did no one else; that was going to deny him raises but give him more work; that was going to give him poor evaluations when his work performance was excellent; that will do anything to get rid of him because he serves his country as a United States Marine.

66. A reasonable person in SSgt. Camacho's position would have felt compelled to resign.

**The Parties:**

67. Plaintiff, Michael Camacho ("Mr. Camacho"), is a citizen of the United States and at all times relevant to this Complaint, was a resident of Cook County, Illinois, and was employed by Defendant, within the meaning of 38 U.S.C. § 4303(3), at Defendant's offices in Chicago, Illinois.

68. Defendant, CareerBuilder, LLC. ("CareerBuilder"), is a corporation conducting business in Cook County, Illinois, and is an employer of Plaintiff within the meaning of 38 U.S.C. § 4303(4)(A).

**Jurisdiction and Venue:**

69. This court has jurisdiction over Defendant pursuant to 28 U.S.C.S. § 1331 and 38 U.S.C. 4323(b)(3).

70. Venue is proper pursuant to 28 U.S.C.S. §1391(c) and 38 U.S.C. § 4323(c)(2) because the unlawful employment practices alleged herein occurred in Cook County, Illinois, which is within this Court's division of the U.S. District Court, Northern District of Illinois.

**COUNT ONE: Violation of USERRA**

71. Plaintiff incorporates and realleges paragraphs 1 through 66 herein.

72. Based upon the foregoing, Defendant CareerBuilder, LLC willfully violated the Uniformed Services Employment and Reemployment Act ("USERRA"), 38 U.S.C. § 4301 *et seq.,* when it compensated SSgt. Camacho less favorably than non-military employees who did not exercise reemployment rights under USERRA.

*Wherefore,* Plaintiff Michael R. Camacho prays for the following relief:

a. That the court order judgment in his favor, and award Defendant to pay backpay and reimburse Plaintiff for all other benefits that Plaintiff would have received but for Defendant's conduct; and, order Defendant pay Plaintiff frontpay in an amount to compensate Plaintiff for earnings he would have received but for Defendant's conduct; and,

b. That the court order Defendant pay liquidated damages; and,

c. That the court order Defendant reimburse Plaintiff for all employment benefits, including retirement benefit contributions and stock options, that Plaintiff would have received but for Defendant's conduct; and,

d. That the court order Defendant pay all reasonable costs and attorney's fees incurred by Plaintiff as a result of Defendant's actions; and,

e. That the court award prejudgment interest on any and all damages to which the Court finds Plaintiff is entitled; and,

f. That the court award Plaintiff any other relief that the court deems just.

**COUNT TWO: Violation of USERRA for SSgt. Camacho's constructive discharge**

73. Plaintiff incorporates and realleges paragraphs 1 through 66 herein.

74. Based upon the foregoing, Defendant CareerBuilder, LLC willfully violated the Uniformed Services Employment and Reemployment Act ("USERRA"), 38 U.S.C. § 4301 *et seq.,* when it conspired to terminate SSgt. Camacho's employment, and then constructively discharged SSgt. Camacho, because he was a member of the United States Marine Corps Reserve.

*Wherefore,* Plaintiff Michael R. Camacho prays for the following relief:

a. That the court order judgment in his favor, and order Defendant to pay backpay and reimburse Plaintiff for all other benefits that Plaintiff would have received but for Defendant's conduct; order Defendant pay Plaintiff frontpay in an amount to compensate Plaintiff for earnings he would have received but for Defendant's conduct; and,

b. That the court order Defendant pay liquidated damages; and,

c. That the court order Defendant reimburse Plaintiff for all employment benefits, including retirement benefit contributions and stock options, that Plaintiff would have received but for Defendant's conduct; and,

    d. That the court order Defendant pay all reasonable costs and attorney's fees incurred by Plaintiff as a result of Defendant's actions; and,

    e. That the court award prejudgment interest on any and all damages to which the Court finds Plaintiff is entitled; and,

    f. That the court award Plaintiff any other relief that the court deems just.

**COUNT THREE: Violation of USERRA for retaliation**

75. Plaintiff incorporates and realleges paragraphs 1 through 66 herein.

76. Based upon the foregoing, Defendant CareerBuilder, LLC willfully violated the Uniformed Services Employment and Reemployment Act ("USERRA"), 38 U.S.C. § 4301 *et seq.,* when it retaliated against SSgt. Camacho for reporting discriminatory actions committed against him to Defendant's human resources personnel and the appropriate government agencies.

*Wherefore,* Plaintiff Michael R. Camacho prays for the following relief:

    a. That the court order judgment in his favor, and order Defendant to pay backpay and reimburse Plaintiff for all other benefits that Plaintiff would have received but for Defendant's conduct; order Defendant pay Plaintiff frontpay in an amount to compensate Plaintiff for earnings he would have received but for Defendant's conduct; and,

    b. That the court order Defendant pay liquidated damages; and,

    c. That the court order Defendant reimburse Plaintiff for all employment benefits, including retirement benefit contributions and stock options, that Plaintiff would have received but for Defendant's conduct; and,

    d. That the court order Defendant pay all reasonable costs and attorney's fees incurred by Plaintiff as a result of Defendant's actions; and,

    e. That the court award prejudgment interest on any and all damages to which the Court finds Plaintiff is entitled; and,

    f. That the court award Plaintiff any other relief that the court deems just.

                                              Respectfully submitted,
                                              Michael R. Camacho,
                                                          Plaintiff,

                                        By:        s/Lisa M. Stauff

                 Lisa M. Stauff, his attorney

Lisa M. Stauff  
Law Offices of Lisa M. Stauff  
53 W. Jackson Blvd., Suite 660  
Chicago, Illinois 60604  
(312) 212-1036  
LStauff@StauffLaw.com